## THE STATE OF MARYLAND *vs.* THE BALTIMORE AND OHIO RAIL-ROAD COMPANY.—*December,* 1847.

The Board of Directors of the *Baltimore and Ohio Rail-road Company* having applied $146,816 of the net revenue of the Company for the year 1846, to the re-construction of the road between *Harper's Ferry and Baltimore,* and for machinery and other purposes, leaving a cash balance of only $90,504, and designing to reimburse the stockholders for the amount so applied, in November, 1846, declared a dividend of three dollars per share, payable on and after the 20th of that month, as follows : to all stockholders of less than fifty shares, cash; to all of fifty shares and over, one dollar per share in cash, and two dollars per share in the Company's bonds, bearing interest payable quarterly, and redeemable in twenty years, and deliverable to the stockholders at the office of the Company. The State being a stockholder to the amount of five thousand shares, refused to receive the dividend as declared by the Company, and instituted an action of *assumpsit,* to recover the amount of *three per cent.* in money. *Held,*

That by the 14th section of its charter, (act of 1836, ch. 123,) the President and Directors of said Company were invested with *all the rights and powers necessary to the construction and repair of a Rail-road from the city of Baltimore to the Ohio River,* and had a right to expend any part of its revenue for the re-construction of the road.

That the Company could make such expenditure absolutely, and without being bound to refund, or they might appropriate and agree to refund to the stockholders in their discretion.

Under the 19th section of the charter, the Directors are bound to divide only such part of the net profits as they may deem proper,—and their judgment of what is proper is conclusive upon the stockholders.

They can apply any portion of the net profits not divided, to any legitimate purpose of the Company.

In all questions of power arising under an act of Assembly, granting a franchise of this description, the test of the existence of the power is to be found in the inquiry, whether the same is expressly granted, or whether it is incidental to any express grant of power, and necessary to its accomplishment.

The established rule, that every corporation is limited in its powers by the object to be accomplished; and if there be a specification of the means for accomplishing a particular object, then such specification excludes all others, is admitted, but is not considered as applicable to this case.

The 13th section of this charter, giving the power to increase the capital stock on the terms therein mentioned, and to borrow money—however it may exclude other means of accomplishing the construction of the road—is no limitation of the grant of *all powers,* limited only by their necessity, conferred by the 14th sec.

The design of the 19th sec. was to define what was to be the subject of the dividend, and to prescribe the mode of dividing among the stockholders, and to allow a dividend from time to time, if the President and Directors deemed it proper; but if, in the honest discharge of their duties, they deemed that

the net profits should be otherwise applied to further the objects of the act of incorporation, they were at liberty to withhold a dividend.

The 13th sec. authorizing the purchase of motive power, &c. with the funds of the Company, to be placed on any *Rail-road constructed by them under the act*, confers the same authority as if there had been a general power to purchase, without any reference to the funds of the Company, and does not militate against the construction above given to the 14th sec.

The true construction of the 9th sec. of the act of 1835, ch. 395, which guarantees to the State the payment of the interest on the instalments advanced by her on the stock subscribed for under that act, is that this guarantee is to be satisfied out of the *gross profits* of the Company: and this guarantee is in no manner impaired by the act of 1838, ch. 386.

The State was not bound to receive these bonds, (though if accepted, they would have been valid in her hands,) but might treat the dividend, so far as it proposed their delivery, as illegal,—and she has a remedy commensurate with the injury thereby sustained, but not in the form of an action of general *indebitatus assumpsit.*

By instituting this form of action, the State affirmed the dividend, and must take it as it is. Hence, she cannot recover the $15,000 in this suit, because the dividend declared did not profess to be a dividend to that extent in money.

The relation of trustee and *cestui que trust* exists in a qualified sense, as between the directors and the stockholders, and the funds in the hands of the former in which the latter have an interest, cannot be sued for in this form of action, unless a dividend has been declared.

The charter of the Company does not justify the discrimination made between the large and small stockholders, giving to the latter *three per cent.* in money, and to the former, money and bonds:

There can be no recovery in this case of the $5,000, which was the amount of the cash dividend payable to the State, there having been no demand for payment thereof, either of the Company, or its authorized agents; such previous demand being clearly necessary to maintain this suit.

The establishment of the principle, that suits could be instituted without demand, for dividends declared by banking and other corporations, would greatly impair the value of stocks held therein.

Interest will not be chargeable against an incorporation on dividends declared, nor will limitations run until demand made.

APPEAL from *Baltimore* County Court.

By a resolution of the General Assembly of *Maryland*, passed at its December session, 1846, the Attorney General was directed to institute suit against the *Baltimore and Ohio Rail-road Company*, to recover the dividend of $15,000, which had been declared by that Company, payable in part in the bonds of said Company. An action of general *indebitatus assumpsit*

was accordingly docketed, by consent of parties, in *Baltimore* County Court at its May term, 1847, by the appellant against the appellee. The declaration contained the common money counts, and a count upon an account stated,—to which the defendant, the appellee, pleaded *non-assumpsit.* At the trial, the plaintiff, to maintain the issue on its part, offered in evidence the advertisement, admitted to have been published by the authority and direction of the defendant in the *"Baltimore Patriot,"* which is recited in the opinion of the court.

It was also admitted, that the plaintiff was at the time when said dividend was declared, the holder of five thousand shares of the capital stock of the *Baltimore and Ohio Rail-road Company.*

The plaintiff further offered in evidence, the Twentieth Annual Report of the President and Directors to the stockholders of the defendant. The letter of *Mr. McLane,* President of said Company, to *Thomas Donaldson, Esq.* and the resolution, No. 65, of the legislature of *Maryland* of December session, 1846 ; all which are sufficiently stated in the opinion of the court.

The defendant then offered the charter of the *Baltimore and Ohio Rail-road Company,* (act of 1826, ch. 123,) and its supplements. They also offered in evidence an extract from the proceedings of the meeting of the Board of Directors, declaring the dividend, by which it appears the following resolution was passed on the 26th November, 1846, without a division :—

*"Resolved,* that a dividend of *three per cent.* be declared on the stock of the Company, to be paid to all stockholders owning on the first day of the present month less than fifty shares, in cash ; and to all stockholders holding fifty or more shares, one-third of the amount in cash, and two-thirds of the amount in bonds, to be issued in accordance with the resolution of the board, passed on the 3d December, 1845, authorizing the issue of bonds ; and also of another resolution on the first day of the present month, and that said dividend be payable on the 20th November next."

They also proved that at the time the dividend was declared, there were present at the meeting six of the Directors on the part of the State. They further proved that the money to pay the cash part of the said dividend, was deposited at the *Commercial and Farmers' Bank*, to be paid to all stockholders who might demand the same—and that the certificates of stock were in readiness for delivery for the other portion of said dividend at the office of the Company in *Baltimore*,—and that all the stock had been issued and delivered to the stockholders, in accordance with the terms of the resolution declaring the dividend, except the stock that was payable to the State; and also that the entire dividend in cash had been paid, except the State's portion and some small sums not called for, but not exceeding what usually remains unpaid for a longer or shorter time after every dividend.

The defendant further offered in evidence the message of the Governor to the legislature of 1846–'7, and the proceedings of the annual meeting of the stockholders of the *Baltimore and Ohio Rail-road Company*, held in October, 1846, accepting the annual Report of the President.

Whereupon, the plaintiff prayed the opinion and direction of the court to the jury, as follows:—

1st. That the President and Directors of the *Baltimore and Ohio Rail-road Company* had not, under their charter, the right to appropriate and expend the revenue of the road for 1846, or any part thereof, for the re-construction of the road, under the resolution passed by the board on the 5th January, 1846; and that the portion of the revenue, as expended by the board, constituted a part of the net profits of the road for the year 1846, of which the dividend for that year was to be declared and made under the 19th sec. of the defendants' charter.

2d. If the jury shall find from the evidence, that the President and Directors of the *Baltimore and Ohio Rail-road Company* did, out of the net profits of the road for the year 1846, in October in that year, declare a dividend of three dollars per share on their capital stock, payable in the mode set

out in their advertisement, offered in evidence by the plaintiff; and that the State was on the 1st October, a holder of five thousand shares of said stock; that then the mode of payment specified in said advertisement is not obligatory on the plaintiff, and the plaintiff is entitled to recover the whole of its dividend on said stock in money.

3d. If the jury shall find from the evidence that the President and Directors of the *Baltimore and Ohio Rail-road Company* did, in October, 1846, declare a dividend of three dollars per share on the capital stock of said Company, and made the same payable in the mode specified in the advertisement offered in evidence by the plaintiff; and shall also find that the net profits of the said Company for that year, received by the President and Directors, were more than sufficient to pay said dividend; and that the plaintiff was a holder of five thousand shares of said stock on the 1st October, 1846; that then the plaintiff is entitled to recover the whole of its said dividend, although the jury shall believe that at the time when said dividend was declared, the said President and Directors had not sufficient cash on hand to pay the same.

4th. If the jury shall find from the evidence, that the President and Directors of the *Baltimore and Ohio Rail-road Company* did, in October, 1846, declare a dividend of three dollars per share on the capital stock of said Company, and made the same payable in the mode specified in the advertisement offered in evidence by the plaintiff; and that the plaintiff was on the 1st October, 1846, a holder of five thousand shares of said stock; that then the plaintiff is entitled to recover in this action the whole of its said dividend in money.

And the defendant prayed the opinion and direction of the court to the jury as follows:—

1st. That the Company had a right to appropriate, as they did, $146,816 to the purposes of the road, as stated in the annual report of defendant offered in evidence by plaintiff.

2d. That it was the right of the Company by its Directors, to make such appropriations absolutely, and without being bound to refund the same to the stockholders, or to appro-

priate and agree to refund it to the stockholders, in their discretion.

3d. That under the 19th sec. of the charter, the Directors are only bound to divide, annually or semi-annually, such portion of the net profits of the Company as they may deem proper,—and that their judgment of what *is proper* is conclusive upon the stockholders.

4th. That whatever amount of net profits is not from time to time divided, but retained by the board in the exercise of their judgment, under the authority vested in them by said 19th sec. they have a right to apply to any of the legitimate purposes of the Company.

5th. That the defendant having offered to pay the dividend which was declared in the mode in which it was made payable, and the plaintiff having refused so to receive it in that mode, or to receive any less sum in cash than $15,000, if the jury find that the plaintiff did so refuse, the plaintiff cannot recover in this case even the amount which was made payable in cash.

And the plaintiff then offered the following additional prayer:—

The plaintiff wishes the court further to instruct the jury, that under the *fifth* prayer of the defendant, they must find an actual offer on the part of the defendant, and an actual refusal on the part of the plaintiff, mutually communicated, the one to the other; and that the mere publication of the said advertisement given in evidence, although the same was known to the plaintiff, is not a sufficient offer, nor the meaning of said prayer: and the mere determination of the treasurer, not to take the dividend as declared, and the communication of that determination by him to the legislature, is not a sufficient refusal within the meaning of said prayer.

And the court rejected and refused all the prayers offered on the part of the plaintiff, and granted all offered by the defendant: to which rejection and refusal of the plaintiff's prayers, and to the granting of the said prayers of defendant,

the plaintiff excepted, and the verdict and judgment being for the defendant, the plaintiff appealed.

The sections of the charter of the *Baltimore and Ohio Rail Company*, specially referred to in the opinion of the court, are as follows :—

13. *And be it enacted*, That if the capital stock of said Company shall be deemed insufficient for the purposes of this act, it shall and may be lawful for the President and Directors of said Company, or a majority of them, from time to time, to increase the said capital stock by the addition of as many shares as they may deem necessary, for which they may, at their option, cause subscriptions to be received in the manner prescribed by them, or may sell the same for the benefit of the Company, for any sum not under their par value; and that they, or a majority of them, shall have power to borrow money for the objects of this act, to issue certificates or other evidences of such loans, and to pledge the property of the Company for the payment of the same, and its interest.

14. *And be it enacted*, That the President and Directors of said Company shall be, and they are hereby invested with all the rights and powers necessary to the construction and repair of a Rail-road from the city of *Baltimore*, to some suitable point on the *Ohio River*, to be by them determined, not exceeding *sixty-six feet* wide, with as many sets of tracks as the said President and Directors, or a majority of them, may deem necessary; and they, or a majority of them, may cause to be made, or contract with others for making said Rail-road, or any part of it; and they, their agents, or those with whom they may contract for making any part of the same, or their agents may enter upon, and use and excavate any land which may be wanted for the site of said road, or the erection of warehouses, or other works necessary to said road, or for any other purpose necessary or useful in the construction or repair of said road, or its works; and that they may build bridges, may fix scales and weights, may lay rails, may take and use any earth, timber, gravel, stone, or other materials, which may be wanted for the construction or repair of any part of said road,

47     v.6

or any of its works, and may make and contract all works whatsoever, which may be necessary and expedient in order to the proper completion of said road; and that they, or a majority of them, may make, or cause to be made, lateral Railroads in any direction whatsoever, in connection with said Rail-road from the City of *Baltimore* to the *Ohio River*, and in the construction of the same or their works, shall have, possess, and may exercise all the rights and powers hereby given to them, in order to the construction or repair of the said Railroad from the city of *Baltimore* to the *Ohio River*.

18. *And be it enacted*, That the said President and Directors, or a majority of them, shall have power to purchase with the funds of said Company, and place on any Rail-road constructed by them under this act, all machines, wagons, vehicles, or carriages of any description whatsoever, which they may deem necessary or proper for the purposes of transportation on said road; and they shall have power to charge for tolls upon (and the transportation of persons,) goods, produce, merchandize, or property of any kind whatsoever transported by them along said rail-way from the city of *Baltimore* to the *Ohio River*, any sum not exceeding the following rates, &c.; and that the said road or roads, with all their works, improvements and profits, and all the machinery of transportation used on said road, are hereby vested in the said Company incorporated by this act, and their successors forever; and the shares of the capital stock of the said Company shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burthen by the States assenting to this law.

19. *And be it enacted*, That the said President and Directors shall annually, or semi-annually, declare and make such dividend, as they may deem proper, of the net profits arising from the resources of the said Company, after deducting the necessary current and probable contingent expenses; and that they shall divide the same amongst the proprietors of the stock of said Company, in proper proportions to their respective shares.

The 9th sec. of the act of 1835, ch. 39, containing a guarantee to the State, is as follows:—

Sec. 9. *And be it enacted,* That before any subscription shall be made to the capital stock of the said *Baltimore and Ohio Rail-road Company,* under and by virtue of this act, the stockholders of said Company shall, in general meeting assembled, stipulate, agree and bind the said Company by a proper instrument of writing, signed by the President, and under the corporate seal thereof, to be lodged with the Treasurer of the *Western Shore,* to guarantee to the State of *Maryland,* after the expiration of three years from the payment by the State, of each of the instalments on the stock hereby authorized to be made to the stock of said Company, the payment from that time out of the profits of the work, of six per cent. per annum, payable semi-annually, on the amount of money which shall be paid to said Company, under and by virtue of this act, until the clear annual profits of the said Rail-road shall be more than sufficient to discharge the interest which it shall be liable so to pay to the State of *Maryland,* and shall be adequate to a dividend of six per cent. per annum among its stockholders, and thereafter, the State shall, in reference to the stock so subscribed for, and on so much thereof as the State may hold, be entitled to have and receive a perpetual dividend of six per cent. per annum out of the profits of the work, as declared from time to time, and no more, and all and so much of such annual profits as shall exceed six per cent. shall be distributed to the other stockholders, according to their several interests in the said Company; and in consideration of the interest so to be secured to the State, the said *Baltimore and Ohio Rail-road Company* shall be, and they are hereby authorized, in addition to the charge now authorized to be made by said Company, for the transportation of passengers, to increase the price or charge for such transportation, to any amount not exceeding one cent per mile for each person passing on said road: and the *Eastern Shore Rail-road Company,* the *Maryland Canal Company,* and the *Annapolis and Potomac Canal Company* are hereby respectively required as a condition precedent to the subscriptions by

this act, authorized to said Companies respectively, to enter into covenants with the State of *Maryland*, under the corporate seal of each of said Companies respectively, to pay to the State of *Maryland*, semi-annually, by each of said Companies respectively, out of the profits of said respective works, a sum equal in amount to the sum of six per cent. per annum, on the subscriptions authorized by this act, to be made on certain other conditions to the capital stock of the said respective Companies; such payments of interest not to be made to the State, until the expiration of three years from the payment of each instalment on the subscription to the respective Companies aforesaid, and any excess of dividends on the capital stock of the State, in either of said Companies, above six per cent. per annum, shall be distributed to the other stockholders of the Company declaring such excess of dividend.

The cause was argued before ARCHER, C. J., DORSEY, CHAMBERS, MAGRUDER and MARTIN, J.

By GEO. R. RICHARDSON, *Attorney General*, and J. NEVETT STEELE for the appellant.

By REVERDY JOHNSON and JOHN NELSON for the appellee.

On the 14th February, 1848, before the final decision of the case, the following opinion and suggestion was filed by the court:—

"We are of opinion that power is conferred on the President and Directors of the *Baltimore and Ohio Rail-road Company*, by its charter, to apply the revenues of the Company to the extension of the road to its *terminus* on the *Ohio River*, and that it has power to apply its revenues to the re-construction of any part of the road; that it has power, in its discretion, to declare dividends on the net profits of the road, or it may apply said net profits to construction or re-construction, or generally, to the prosecution of the objects of the charter. That such determination does not affect the guarantee of the State on her

$3,000,000 loan to said Company, provided for by the act of 1835, ch. 395, because, by a proper construction of the acts of Assembly in relation thereto, that guarantee is to be satisfied out of the gross profits of the Company, before any portion of the profits can be applied to the extension, or re-construction of the road, or its repair. That the Company, as is conceded, in making a dividend, has no power to discriminate between its stockholders.

" That if the State could recover her claim of $15,000 in this suit, no demand on the Company, previous to the suit, was necessary to enable it to maintain this suit. That if the claim of the State should be limited to $5,000, then the State could not, in this action, recover the said sum of $5,000, without a previous demand.

" For the present, the court do not propose to decide whether the State can recover the whole sum of $15,000 claimed in this suit. We propose to postpone the consideration of this question, so important to the public, the bondholders, and the corporation, in the hope that the legislature may, by its action on the part of the State, consent to accept these bonds, and that they may by law declare such dividends on bonds in future, illegal, which if accepted by the Company, would be binding upon it.

" Should nothing be done by the General Assembly in reference to this recommendation, which the court respectfully make, we shall, at the next term of this court, proceed to decide this question, and in the opinion we shall pronounce, we shall give the reasons which shall govern us upon this and upon all the points in the record.

" The clerk of the court is directed to transmit a copy of the above to the President of the Senate, the Speaker of the House of Delegates, and the President of the *Baltimore and Ohio Rail-road Company.*"

A duly certified copy of the following resolutions of the General Assembly in reply to the above, passed February 23d, 1848, was sent to the court, and filed in the cause on the 1st March, 1848:—

"Whereas, by resolution No. 65 of December session, 1846, the Attorney General was directed to institute suit against the *Baltimore and Ohio Rail-road Company*, to recover the dividend of $15,000 which had been declared by that Company, payable, in part, in the bonds of said Company; and whereas, it is understood, that said suit was brought, as directed by said resolution, and that the same has been fully argued in the Court of Appeals at the present term, and inasmuch as the State has incurred the whole expense incident to the decision of this question, it is *therefore*

"*Resolved*, That it would be unjust to the State to take the bonds of this Company for the dividend declared, provided, the State should be entitled to receive said dividend in money.

"And whereas, in the view that the legislature will not again assemble for two years, it is important that the legislature should decide at the present session upon the course which the interest of the State will make advisable in reference to said dividend,—*therefore*,

"*Be it further resolved, by the General Assembly of Maryland,* That the Court of Appeals be respectfully requested to decide fully, all the questions which are presented for their decision in said case, in time to enable this legislature to act upon the subject of said dividend, after the delivery of such opinion by the court.

"*Resolved*, That a certified copy of the aforegoing preamble and resolutions be sent to the judges of the Court of Appeals, immediately after the passage hereof."

On the 4th March, the following opinion and order of the court was filed:—

"We are of opinion that if the State had accepted the bonds, they would have been valid in her hands; but the State having refused to accept its *quota* of the dividend declared, in the manner it was declared, has a remedy commensurate with the injury she may have sustained in consequence of such a declaration of dividend. But what shall be the remedy of the State, as the question has not been discussed, and is not before us, we forbear to decide.

" In this action of general *indebitatus assumpsit*, there can be no recovery of the $15,000, because there was not money in hand to divide that sum, and the dividend declared did not profess to be a dividend to that extent in money."

**JUDGMENT AFFIRMED.**

The opinion of the court was afterwards delivered at length, as follows:—

JUDGE CHAMBERS dissented in part, and delivered the following opinion:—

I do not concur in that portion of the opinion expressed by the majority of the court, which decides the right of the State to recover; or that which decides upon the contingent validity of the bonds issued or executed by the Company to the State, for $10,000.

The questions, (in reference to this part of the case,) involved in the record and argued at the bar, were, first, whether the act of the Board of Directors in declaring a dividend in part payable in bonds, was a lawful exercise of authority, and obligatory on the State ; and if not, then whether the present action could be sustained by the State, for the $10,000, the nominal value of the bonds.

The court has declared, that " no discrimination can be made between stockholders, in making a dividend."

It would seem to follow, necessarily, from this position, that, in this instance, the issue of bonds was unauthorized; and, if the President and Directors, by their charter, had no authority to issue the bonds, they are not obligatory on the stockholders, for whom the Directors were trustees.

The argument was not at all directed to maintain, or deny, the right of the State to recover the specific sum of $10,000, or any other sum, in any form of action other than that resorted to, and without the aid of an argument I am unwilling to go beyond the points necessarily arising in the cause, to decide questions, in regard to which difficulties are apparent to my mind.

MAGRUDER, J., delivered his opinion as follows:

The resolution of the Board of Directors, declaring a dividend payable partly in bonds, and in part in money, is in this suit made the plaintiff's cause of action;—the evidence of its claim.

The court has already decided, that, in this suit, the plaintiff cannot recover the $5,000, for the reasons then stated.

I am further of opinion, that the State cannot recover the $15,000, and this for the reasons stated by a majority of the court, and that the judgment of the court below must be affirmed.

It was because of the difficulties that this proceeding, on the part of the Board of Directors presents, and the very many important and interesting questions, to which that proceeding might give rise, that I united with my brethren in advising the course, which was suggested by us a few days since. If it had been adopted, it would have obviated the difficulties and the evils which too much discussion, or too much opinion, perhaps, will cause, and prevent any such evils in future.

Disappointed in this, I can only say that the judgment must be affirmed.

ARCHER, C. J., delivered the opinion of this court.

The following paper, purporting to be a declaration of dividend, made by the defendant in this case, has given rise to the present controversy.

"OFFICE OF THE BALTIMORE AND OHIO R. R. COMP'Y,
*November 4th,* 1846.

"The President and Directors have declared a dividend, on the stock of the Company, as standing on the books on the first day ——— 1846, of three dollars per share, payable on and after Friday, the 20th day of the present month, in the manner following, to wit: to all stockholders of less than fifty shares, cash, at the *Commercial and Farmers' Bank;* and to all stockholders of fifty shares and over, one dollar per share in cash, at the *Commercial and Farmers' Bank,* and two dollars per share in the Company's bonds, bearing interest payable quarterly, re-

deemable in twenty years, and deliverable to the stockholders at the office of the Company.     J. J. ATKINSON, *Sec'y*."

The Twentieth Annual Report of the Company, offered in evidence in this case, furnishes the basis and the reasons which actuated the Company in the above proceeding. In this report it is said, that the net revenue, including the receipts from the coal trade, after deducting the expenses of working and keeping the road in repair, amounted to the sum of $440,475 34. Of this sum, however, besides $65,749 64, (being principal and interest, and premium, in sterling bills,) on account of the debt due the *Messrs. Barings*, there have been applied, during the year, to the re-construction of the road, and to the construction of burthen cars adapted to the general trade, to improvements at the depots, and to right of way, to the purchase of locomotive engines, and to the construction of water stations, to the purchase of additional power and machinery for the accommodation of an increasing coal trade, and on account of a subscription on behalf of the Company, to the capital stock of the *Pittsburgh and Connellsville Rail-road*, the further sum of $284,184 76, making together $349,934 40, and leaving, of the net revenue of the year, at the disposal of the Board, the sum of $90,540 94, or about one and a quarter *per cent*.

It appears, by the same report, that the Board determined to raise the means for the re-construction of the entire length of the road between *Harper's Ferry* and *Baltimore*, by the sale of the Company's six *per cent*. bonds, payable in twenty years, and believing that a sufficient sum for this purpose might, in this way, be raised, in parcels, to meet their engagements, they directed thirty miles of the road to be immediately placed under contract.

The sale of the bonds, as contemplated, was not, however, effected—their price in the market not, in the opinion of the Board, justifying such sale, and they temporarily applied the revenues of the Company towards the consummation of this object, designing at the time, however, to reimburse the stockholders, and also to reimburse the stockholders, for such

48     v.6

amount of the annual revenues of the Company, as had theretofore been applied to enable the Company to provide the necessary power and machinery, to enable them to commence and carry on the coal trade.

Upon this principle, adding the sums applied from the revenue, for the re-construction of the road, and for the power and machinery for the coal trade, (after deducting the sum of $43,312 14, with which that trade had been credited,) amounting together to $146,816 05, to the residue of the surplus, to wit, $90,504 94, there would remain a net surplus of revenue of $237,356 99, expended and unexpended.

With the intention of carrying out the original design of reimbursing the stockholders, for such amount of revenue of the Company as had been applied, from time to time, to the purposes of the Company, above adverted to, and having only in hand cash to the amount of $90,504 94, it was determined that the sum of $146,816 05, expended as above detailed, should form the basis upon which the stockholders should be reimbursed, by bonds of the Company, to be issued in favor of the stockholders.

It appears from the evidence, that the money to pay the cash part of the dividend was deposited in the *Commercial and Farmers' Bank*, to be paid to all stockholders who might demand the same; and that the certificates of stock were in readiness, for delivery, for the other portion of said dividend, at the office of the Company in *Baltimore;* and that all the stock had been issued and delivered to the stockholders, in accordance with the terms of the resolution declaring the dividend, except the stock that was payable to the State; and also, that the entire dividend, in cash, had been paid, except the State's portion, and some small sums not called for, but not exceeding what usually remains unpaid, for a longer or shorter time, after every dividend.

The State, being a stockholder, and refusing to receive the dividend thus declared by the Company, as it was declared, has instituted this action to recover the amount of *three per cent.* in money, considering the dividend in the same light,

and as having the same legal effect, as if it had been declared in money, and not in money and bonds. The prayers of the plaintiff and defendant present the following propositions for the consideration of the court, so far as the charter is concerned.

1st. Had the Company a right to expend any part of its revenue for the re-construction of the road?

2d. Could it make such expenditure, absolutely, and without being bound to refund, or might it appropriate and agree to refund to the stockholders, in their discretion?

3d. Under the 19th section of the charter, are the Directors bound to divide only such part of the net profits, as they may deem proper? and is their judgment of what is proper conclusive upon the stockholders?

4th. Can they apply any portion of the net profits not divided, to any legitimate purposes of the Company?

The determination of these questions depends on the construction of the act of 1826, ch. 123, entitled, "An act to incorporate the *Baltimore and Ohio Rail-road Company;*" which act is the charter of this Company.

By the 14th section of this law, the purpose and object of the charter is disclosed. Its design is there declared to be, " to make a *Rail-road* from the city of *Baltimore* to some suitable point on the *Ohio* river;" by the 22d section of this act, the road was required to be finished within twelve years from the passage of the law ; and by the 2d section, it is declared, that the capital stock of the Company shall consist of three millions of dollars.

In all questions of power, arising under an act of assembly granting a franchise of this description, the test of the existence of the power, is to be found in the inquiry, whether the same is expressly granted, or whether it is incidental to any express grant of power, and necessary to its accomplishment?

The 14th section declares, that " the President and Directors of said Company shall be, and they are hereby invested, *with all the rights and powers necessary to the construction and repair of a Rail-road, from the city of Baltimore to the Ohio river.*"

Here, then, is a sweeping grant of power, both to *construct* and repair, with no other limitation on its exercise, than that it shall be necessary to accomplish the one object or the other. *All right and power* to accomplish these objects are given, with no other limitation than that just adverted to.

Thus is the power conferred, and thus is the duty imposed, of constructing a Rail-road. For this purpose a capital is provided, of $3,000,000; and this power, and this duty, are to be exercised in no other way, looking to this section alone, than by the means placed at the disposal of the Company, that is, by its capital, and the products of its capital. It was certainly a part of the contract of the Company, when they accepted their charter, that they would make and keep in repair the road, though it required their whole fortune, which consists of their capital, and of the earnings of their capital. These duties the Company undertook to perform, with the means placed by the charter at their disposal; subject, however, to the right, conferred by the 19th section, at the discretion of the President and Directors to divide the net profits. To accomplish a work of this vast magnitude, requiring a costly Rail-road to be made over a difficult and mountainous country, required enlarged powers; and they were liberally given, in the section under consideration. It has been urged, that it is an established rule that every corporation is limited in its powers by the object to be accomplished, and if there be a specification of the means for accomplishing a particular object, then such specification excludes all others. The rule is admitted. But we do not consider it as applicable to this case. The means for accomplishing the object, it is said, are provided by the 13th sec. of the act. That section is as follows:

" That if the capital stock of said Company shall be deemed insufficient for the purposes of this act, it shall and may be lawful for the President and Directors of the said Company, or a majority of them, from time to time to increase the said capital stock, by the addition of as many shares as they may deem necessary, for which they may at their option cause subscriptions to be received in the manner prescribed by them,

or may sell the same for the benefit of the Company, for any sum not under their par value; and they, or a majority of them, shall have power to borrow money for the objects of this act; to issue certificates, or other evidence of such loans; and to pledge the property of the Company for the payment of the same and its interest."

The above section undoubtedly does specify powers for the purpose of accomplishing the object,—that is, it gives the power to increase the capital of the stock, on the terms therein mentioned, and the power to borrow money.

But such specific powers, given as a means of accomplishing a power, however it might exclude other means of accomplishing the construction of a road, furnishes most certainly no limitation of a grant of *all powers*, limited only by their necessity; and this, we have seen, is the grant of power in the 14th section.

It is obvious that the legislature, having granted the specific powers referred to in the 13th section, were apprehensive that, by these means, the great object had in view by the act could not be accomplished; they therefore, the more effectually to carry out these purposes, by the 14th section endowed the Company with *all rights and powers* necessary to make and keep the road in repair. And in so doing they had a wise foresight; for, if the Company were to be made dependent on the means provided by the 13th section, for constructing the road, it might be questionable whether the great purpose of the act could ever be effected. The evidence in the cause shows us that, even in 1846, the stock of the Company could not be sold but at ruinous sacrifices; and this suit apprizes us that, even with the aid of extensive liens, money could not be borrowed but upon unfavorable terms.

The 19th section interposes no difficulty in the way of the above construction. That section we will advert to. It is in the following words:

" *And be it enacted,* That the said President and Directors shall annually, or semi-annually, declare and make such dividend *as they may deem proper,* of the net profits arising from the

resources of the said Company, after deducting the necessary current and probable contingent expenses ; and that they shall divide the same amongst the proprietors of the stock of said Company, in proper proportions to their respective shares."

There is clearly nothing in this section which is in any manner imperative on the Company to declare dividends of their net profits. Their duty is defined to make such dividend as *they may deem proper* from the resources of the Company. If, in the honest exercise of their duties, looking to the whole interest of the Company, they deemed that the net profits should be otherwise applied, to accomplish or further the objects of the act of incorporation, they were at liberty to withhold a dividend.

The design of this section was, to define what was to be the subject of a dividend, and to prescribe the mode of dividing among the stockholders, and to allow a dividend from time to time, if the President and Directors deemed it proper.

If we are right in our construction of this section of the act, then this section strengthens our interpretation of the 14th section. If they are not compelled to divide the net profits, but may retain, then such retention must be to accomplish the objects designated in the 14th section. They could apply them to nothing else legitimately.

The 18th section of the charter, which authorizes the President and Directors to purchase, with the funds of the Company, and place on any *Rail-road constructed by them under the act*, all machines, wagons, vehicles, or carriages of any description, which may be necessary or proper for transportation on said road, does not militate against the construction which we give to the 14th section. This section itself takes a distinction between *the construction* of the road, and the motive power and vehicles for transportation ; and however true it may be, in the language of the President of this Company to the committee of ways and means, that " professionally, *construction* comprehended the whole cost of not only making the railway, but of stocking it with motive power, machinery, and stations of every kind, and also any new appurtenances of the same description

that might from time to time be needed;" still, it seems to have been supposed by the legislature that, to enable the Company to purchase the motive power, &c., some further authority was necessary, and out of abundant caution this power was given by the 18th section. That the section directs the purchase to be made out of the funds of the Company cannot affect the question. The funds of the Company are its entire resources, comprehending its capital and its receipts; and the authority conferred by the section stands as it would have stood if there had been a general power to purchase, without any reference to the funds of the Company.

But it is urged, that if the net profits of the Company can be applied to the construction of the road, or to extraordinary works of repair there would be no profits left to secure the guarantee provided by the 9th section of the act of May session, 1836.

But we think the true construction of that section is, that this guarantee is to be satisfied out of the gross profits of the Company.

This section provides, that the interest on each instalment of stock subscribed shall, after the lapse of three years from the time of payment by the State, be paid out of the *profits* of the work. The term *profits* may mean *gross profits or net profits*. Which it means must be determined by its association, and by the whole clause. Now, in the same sentence, the terms *clear annual profits* are used. Then, in another part of the same section, and in the same sentence, on a contingency therein mentioned, the language is, that the State shall be entitled to receive a perpetual dividend of six per centum per annum, out of the profits of the work, *as declared from time to time.* So that the term profits, as used in the first part of the sentence, is used without limitation or qualification, and wherever afterwards it is used, it is qualified and defined to mean *clear annual profits*, or *as declared* from time to time, which declaration of profits, as declared from time to time, would be only from the *clear annual profits* by the charter. It then appears, that they have used the term profits as contradistinguished

from *net profits*, or *clear annual profits*, or *profits declared from time to time.*   And as this has been done, we think the inference is clear, that by the term profits, as first used in reference to the guarantee, they meant gross profits.   This guarantee is in no manner impaired by the act of 1838, ch. 386.

The above views dispose of the various propositions contained in the prayers, except the question arising under the second proposition, as to the ability of the Company, at its discretion, to appropriate its net revenue, and agree to refund the same to its stockholders, or to make such appropriations absolutely to the purposes of the road.

We have before seen that the Company, in the honest discharge of its duties, may, under the charter, appropriate the net revenue of the Company to the purposes of the charter; it is, we think equally clear, that they may, having appropriated the net revenue of the Company to the purposes of the charter, designing at the time to repay them, agree to refund the same to the stockholders.

If designing to make a dividend of the net profits, they have used them for the purposes of the Company, intending at the time to return them to the stockholders, as was the case in the cause before the court, as is abundantly evident from the Twentieth Annual Report, which is in evidence before the court, we think there is nothing in the charter which would prohibit the Company from refunding the amount thus used by them to the stockholders.   The character of the act ought to be determined by its intention.

The legislature would not, certainly, have designed, that if the Company had on hand $500,000 of net profits, and designing to divide the same, and should from any cause connected with the prosecution of the enterprise, have required the use of $100,000, that they must, in order to carry out their design of dividing the said $500,000 among their stockholders, abstain from the appropriation of any part of the net profits temporarily to that object, and resort to a loan for the purpose, keeping the net profits idle in their coffers, until the period of the declaration of a dividend should arrive.

We are satisfied they might agree to refund the net profits which they may have used, and might, under the powers granted to them by the charter, borrow money to supply the place of that which had been used, and that they might borrow from the stockholders as well as from any one else, and that they had a perfect right, with the consent of the stockholders, to treat the money thus used as a loan, and for this purpose, might pass to the stockholders, who were willing to receive them, their bonds. The *second, third* and *fourth* prayers of plaintiff give rise to other questions.

The propositions contained in these prayers, may be reduced to two.

1st. That the mode of payment specified by the advertisement, was not obligatory on the stockholders, and the plaintiff was entitled to recover.

2d. That the plaintiff could recover the whole of said dividend, though the Company had not sufficient cash on hand to pay the same.

We agree with the first part of the first proposition, which asserts that the mode of dividend was not obligatory on the plaintiff. The plaintiff was certainly not bound to accept the bonds which the Company proposed to deliver. The State, if she pleased, might refuse the bonds, and decline to become a lender to the Company, and certainly the Company could not become a borrower from the State without the State's assent. A forced loan could not be contended for, and a valid loan requires the assent of all the parties. But, although the State was not bound by the mode of dividend, it will not follow that the State is entitled to recover; the reason which conducts us to this conclusion, will be assigned in discussing the second proposition.

Now, as to the second proposition, which asserts that the State can recover the whole amount of the dividend, although the Company had not cash on hand sufficient to pay the dividend, and did not intend to declare a cash dividend of three *per cent.*, but of one *per cent.* only,—we remark that the plaintiff has certainly no standing in court, except upon the

dividend. The relation of debtor and creditor cannot exist as between the Company and the stockholder in this respect, until the dividend is made. The plaintiff, by the institution of this action, affirms the dividend, and he must take it as it is.

The relation of trustee and *cestui que trust*, exists in a qualified sense, as between the President and Directors and the stockholders; and the funds which may be in the hands of the President and Directors, in which the stockholders may have an interest cannot be sued for in an action of general *indebitatus assumpsit*, unless a dividend has been declared. It is immaterial in our view of the subject, whether the declaration of a dividend constitutes a contract, or is to be considered in the light of the performance of a duty. In either case, it is to be taken as it emanates from the Board. A part of it cannot be taken and the rest discarded. It cannot be said you have declared three *per cent.* and we will have the money, although in the very declaration, they say they can only pay you in the liabilities of the Company. All the evidence in the cause demonstrates, that all the net revenue of the Company, designed by the Company for its stockholders, under the provisions of the 19th sec. of the charter, except the cash on hand, at the time of the dividend, was used in the works of the Company; but with the design of repaying it to the stockholders; and that it should, with the assent of the stockholders, assume the shape of a loan. This, we have seen, it was competent for them to do, with the consent of the stockholders; but any stockholder might refuse to receive the liabilities of the Company, thus offered, and might treat the dividend, so far as he was concerned, and so far as the declaration of dividend proposed the delivery to him, of the bonds of the Company, as an illegal dividend; and to the extent, the State has been damnified as a stockholder, by the accomplishment of this loan from the other stockholders, she is entitled to redress, but surely not in the form of an action of general *indebitatus assumpsit*.

Is it not obvious, that if the State is allowed to treat this advertisement as a cash dividend, she is producing the very

injustice of which she complains? She would receive her three *per cent.* in money, and when all the other stockholders above fifty shares, had received but one *per cent.* and the residue in bonds. It is true, the President and Directors have discrimi-nated in this advertisement, between the large stockholders and the small, giving to the latter three *per cent.* in money, and to the others, money and bonds. This, it is conceded, the charter did not justify. But this distribution to the small stock-holders, was a greater proportion of cash, than they were entitled to, looking to the amount of cash in hand for division. The illegal payment to the small stockholders of more cash than from the unexpended funds they were entitled to, could surely furnish no reason, why the State should receive a like sum. If the State, as a stockholder, has received injury by such payment, she no doubt has her remedy, but not that which has been pursued.

The question arising, under the fifth prayer of the defendant, and the last prayer of the plaintiff, is, whether there can be any recovery in this case, of the $5,000, which was the amount of the cash dividend, payable to the State, wtihout a demand being made, either of the Company or its authorized agents, for payment. We are clearly of opinion, that such demand was necessary, before a right of action would exist, on the part of the plaintiff, to recover this dividend. The establishment of the principle, that suits could be instituted without demand for dividends, declared by banking and other corporations, would greatly impair the value of stock held therein, by rendering it necessary to employ agents, to hunt up the stockholders, in various parts of the State, or the Union, in order to prevent a multiplicity of suits, or on a failure to do this, suits, and of consequence, costs might be multiplied to an alarming extent. Such a doctrine has, certainly, never been supposed to exist. Dividends are paid when called for, and we apprehend, that limitations would not run until demand was made.

Moreover, interest would not be chargeable against an incorporation, on dividends declared, until a demand was made,

which could not be so, if the Company was liable without demand.

The decision of this court, in 1 *G. & J.* 425, on the principle which it establishes, bears a strong affinity to this case. There it was decided, that a trustee, ordered by a Court of Chancery, to pay claims allowed by the Chancellor, would not be liable to a suit, until, not only notice should be given to him of the order, but demand made upon him by the claimant, for payment. We do not think the Company stood in the situation of a common debtor, whose business it is to look to a compliance with his engagement. As regards the argument, *ab inconvenienti*, we think it would apply as strongly to the case before the court, as to that case.

**JUDGMENT AFFIRMED.**