(Decided 23rd January, 1894.)

---

John Marshall Thomas, in his own right, and as Executor *vs.* James Gregg, Luther M. Reynolds and Maurice Gregg, Trustees, and others. Margaret Pennington and Clapham Pennington, her husband *vs.* Same.

*Trusts—Bequests of Railroad stock—Stock dividend—Capital and Income—Life tenants—Remainder-men.*

A testator bequeathed in trust, for the sole and separate use and benefit of his daughters during their lives, and at their death to their issue, stock in a railroad company which after the death of

Note. The right to increased stock and stock dividends as between owners of capital and of income is treated with a full review of the previous authorities in a note to *Spooner vs. Phillips,* (62 *Conn.,* 62,) 16 *L. R. A.,* 461.

the testator, which occurred on the 11th of February, 1890, passed a resolution reciting that for the three fiscal years ending 30th of September, 1891, the net earnings of the company had amounted to a specified sum, that they had been used, among other things, for the permament improvement of the railway, and for new construction, and that therefore a dividend of twenty per cent. be declared for said period, "payable in common stock of the company." HELD:

That the dividend was income and not capital, and the daughters were entitled to that earned after the death of the testator.

When it is possible for the Court to ascertain with any certainty whether the distribution in the stock dividend includes net earnings, and if so, what proportion, and also whether such earnings were intended to be made a part of the capital, or merely to be used temporarily, with the intention on the part of the directors of refunding them to the shareholders as income, it is the duty of the Court to make such investigations and dispose of the stock in an equitable way between the tenants for life and the remainder-men.

APPEALS from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ROBINSON, C. J., BRYAN, FOWLER, PAGE, ROBERTS, BOYD, and BRISCOE, J.

*James M. Ambler,* (with whom were *Randolph Barton,* and *Skipwith Wilmer,* on the brief,) for the appellant, John Marshall Thomas.

*W. Cabell Bruce,* (with whom were *D. K. Este Fisher,* and *William A. Fisher,* on the brief,) for the appellants, Mrs. Pennington and her husband.

*Samuel Snowden,* for the appellees.

BOYD, J., delivered the opinion of the Court.

John Gregg died on February 11th, 1890, leaving a last will and testament by which he left one-half of his

property to three trustees, in trust for the sole and separate use and benefit of his daughter, Annie G. Thomas, for and during her natural life, and after her death then in trust to grant and convey, transfer and deliver the same to the issue of her body living at the time of her death, share and share alike, &c. The other half of his property is left to the same trustees for the benefit of his other daughter, Margaret Pennington, for and during her natural life, and after her death to be held in trust for the issue of her body living at the time of her death, share and share alike, &c. In each case provision is made for the disposition of the property in the event of either daughter dying without issue.

Amongst other provisions the will directs the trustees to make, under the orders and supervision of a Court having equity jurisdiction, a division and partition of his estate into two parts.

Mrs. Thomas died in July, 1891, leaving three children and her husband who was made executor of her last will and testament. The trustees filed a petition in the Circuit Court of Baltimore City, asking it to take jurisdiction over the estate, and on September 15th, 1891, that Court did assume jurisdiction over the same. On December 13th, 1892, the trustees filed a bill or petition in said Court asking that they may be directed to make a partition of the estate as authorized by the will. They gave lists of the properties, bonds, stocks, &c. in their possession including 3352 shares of the common stock of the Baltimore and Ohio Railroad Company. On December 19th, 1892, they filed a petition in which they stated they had failed to include in their bill, 670 shares of the common stock of the Baltimore and Ohio Railroad Company which were issued to them in pursuance of a resolution of the board of directors of said company passed on the 11th day of November, 1891, whereby a dividend of twenty per cent. on the common

stock of the company, was declared for the three fiscal years ending respectively September 30th, 1889, September 30th, 1890, and September 30th, 1891, and that the 670 shares of stock were issued to and held by them as dividends or earnings on the 3352 shares of stock mentioned in the bill, and prayed the Court to permit them to amend their bill by including the 670 shares of stock, which amendment was allowed by the Court.

The parties in interest answered the bill as amended. John Marshall Thomas, the husband and executor of Annie G. Thomas, who died in July, 1891, claimed in his answer that inasmuch as the said 670 shares of stock are the dividends and earnings of the 3352 shares of stock, held by the deceased in his life-time for the three years ending September 30th, 1889, September 30th, 1890, and September 30th, 1891, respectively he, as executor of his wife and in his own right, was entitled to one-half of the proportionate part of the said earnings (dividend stock) that were earned between the decease of the testator on February 11th, 1890, and the decease of Mrs. Thomas on July 8th, 1891. Margaret Pennington and husband claimed that the 670 shares of stock were issued as a dividend on account of earnings and income, and that hence she was entitled to one-half of the same as her absolute property.

Testimony was taken, and the Court passed an interlocutory decree for partition, appointing the three trustees commissioners. The commissioners made their return to the Court and included one-half of the said 670 shares of stock in each of the two schedules of the trust property. Mr. and Mrs. Pennington and Mr. Thomas excepted to the return of the commissioners and trustees for the reasons set out in their answers.

The Circuit Court of Baltimore City overruled the exceptions, ratified and confirmed the return in respect to those shares of stock, and directed that they should

Thomas, *et al. vs.* Gregg, *et al.*

be held by the trustees under the will of John Gregg. From this decree appeals were taken by J. Marshall Thomas, in his own right and as executor of Annie Gregg Thomas, and by Margaret Pennington and husband. The first question therefore to be decided is, are the 670 shares of stock issued by the Baltimore and Ohio Railroad Company to be considered as income, and vest in the life tenants, or as capital, and be held by the trustees together with the rest of the trust estate?

Although this Court has never been called upon before to decide this question, it has frequently been before the Courts of England as well as many of the Courts of last resort in this country. We are not helped, but rather embarrassed, however, by the fact that so many Courts have passed upon the question, as we find jurists entitled to our highest respect widely differing on the subject. It is true that some of the decisions can be reconciled by a careful examination of the facts on which they are based, yet there are others which are irreconcilable.

The authorities generally agree that if the intention of the testator can be gathered from the will, it must prevail in determining such questions as are now presented for our consideration, but the will of John Gregg throws but little, if any, light on the subject. There is a class of cases that decide that when the company has the power of distributing its profits as dividends, or of converting them into capital, and it validly exercises such power, it is binding on all persons interested, and what the "company says is income shall be income, and what it says is capital shall be capital." In other words, that the intention of the company shall prevail in determining the question.

This Court decided in *State vs. Balto. & Ohio R. R. Co.*, 6 *Gill*, 363, that the directors of this company are only bound to divide such part of the net profits as they may deem proper; that they can apply any portion of the

net profits not divided to any legitimate purposes of the company, and that they can expend the revenues of the company absolutely, without being bound to refund them, or they could appropriate and agree to refund them to the stockholders in their discretion.

This statement of the power of the directors assumes of course that they would act in good faith.

The only evidence in the case that in any way reflects upon the intention of the company, is the resolution of the directors declaring the dividends, which is as follows:

"Whereas, for the fiscal years terminating September 30th, 1889, 1890 and 1891, the net earnings and income of the company have amounted to the sum of $4,545,272.34—as shown by its reports—after the payment of dividends on the first and second series of preferred stock to the amount of $900,000, the adjustment of sinking fund accounts, and after charging to operating expenses during those years over one million dollars expended in betterments and improvements of the physical condition of the property, and in bringing it up to a higher working standard;

"And whereas, after charging to 'Profit and Loss' of those years the sum of $1,617,051.09—a deduction which has been deemed proper to make by reason mainly of depreciation of the value of equipment, which properly should have been made during the year 1888—there still remains of such net earnings and income the sum of $3,311,455.23, which sum, in addition to the amounts derived from other sources, has been used in reduction of the bonded and car trust indebtedness of the company to the amount of $1,325,102.64, and also for the permanent improvement of the railway, and for new construction, all of which contribute valuable additions to the property and to the capital of the company:

"Therefore resolved, that a dividend of twenty (20) per cent. be declared upon the common stock of this

company for the period ending September 30th, 1891, payable on and after 31st day of December, 1891, in common stock of the company, at the office of the treasurer, to the stockholders of record, on the 30th day of November, 1891." &c.

As so many different views have been expressed by the Courts in passing upon the respective rights of tenants for life, and remainder-men in regard to what are commonly called "stock dividends," it will be well to refer to some of the leading cases.

In *Minot vs. Paine and others*, 99 *Mass.*, 101, what is sometimes called "the Massachusetts' Rule" was adopted, viz., "to regard cash dividends, however large, as income, and stock dividends, however made, as capital."

The Court said that the trustee needed some plain principle to guide him, and deemed the above rule simple and equitable, as well as in conformity with the prior decisions of that Court. In that case the Court held that the distribution of stock of a railroad company to represent improvements on the road, construction of a bridge, &c., although admitted to have been made from the net earnings of the company, should be treated as capital and not as income, and hence should be held by the trustees and not delivered to the life tenant. Regular cash dividends had been paid semi-annually on the stock.

This rule has not been altogether acceptable, and has been somewhat qualified, or modified, by subsequent cases in that State, although the general principle as settled in *Minot vs. Paine*, is still maintained. In *Daland vs. Williams*, 101 *Mass.*, 571, the directors having voted to increase the capital stock by three thousand shares, declared a cash dividend of forty per cent., and authorized the treasurer to receive that dividend in payment for twenty-eight hundred shares, the remaining two hundred shares to be sold, the Court held that the trans-

action was virtually a stock dividend, and that the shares must go to the remainder-man's fund. In *Leland vs. Hayden*, 102 *Mass.*, 542, where the company had invested its surplus earnings in its own stock, and subsequently declared a dividend of that stock, the life tenant was held entitled to it.

The Massachusetts Court in these later cases determined that they can, in deciding whether in a given case the distribution is a stock or cash dividend, consider the actual and substantial character of the transaction, and not its nominal character merely.

See also *Rand vs. Hubbell*, 115 *Mass.*, 461; *Heard vs. Eldridge*, 109 *Mass.*, 258; *Davis vs. Jackson*, 152 *Mass.*, 58. In *Rand vs. Hubbell*, Ch. J. GRAY, in speaking of the earnings of a corporation said: "When a distribution of said earnings is made by the corporation among its stockholders, the question whether such distribution is an apportionment of additional stock or a division of profits, depend upon the substance. and intent of the action of the corporation, as shown by its votes."

In the case of *Gibbons vs. Mahon*, 136 *U. S.*, 549, Justice GRAY uses very much the same language, adding that "ordinarily a divided declared in stock is to be deemed capital, and a dividend in money is to be deemed income, of each share." The Court decided that the new shares issued in that case were capital. The company had paid money dividends from time to time, and had invested portions of its net earnings, income and profits in the enlargement of its plant so that its construction account exceeded one million dollars—being double the capital stock. The capital was increased to one million dollars, and by resolution of the directors the increased stock was awarded to the shareholders, share for share. The greater part of the investments was made prior to the beginning of the life tenancy, although the construction account was increased between one and two hundred thousand dollars afterwards.

The Court practically adopted the Massachusetts Rule, qualified as above stated, and decided that the new stock was capital.

In Connecticut and Rhode Island dividends of new shares representing accumulated earnings, are held to be capital and not income. *Brinley vs. Grou,* 50 *Conn.,* 66; *Brown and Larned, Petitioners,* 14 *R. I.,* 371.

In *Richardson vs. Richardson,* 75 *Maine,* 570, the Court said: "The decided preponderance of authority probably concedes the point that dividends of stock go to the capital *under all ordinary circumstances.*" In Georgia, the Code is construed so as to follow the Massachusetts Rule. *Millen, et al. vs. Guerrard, et al.,* 67 *Ga.,* 284.

In England there have been a number of decisions on this question, and they are somewhat conflicting. The earlier cases decided that an ordinary, regular and usual dividend, whether it be cash, stock or property, belonged to the life tenant, and that an extraordinary dividend belonged to the *corpus.* In the later cases, the Courts have examined into the real nature of the transaction to ascertain the intention of the company. In the case of *Bouch vs. Sproule, L. R.,* 12 *App. Cas.,* 385, 397, where the early English cases are reviewed, Lord HERSCHELL quoted with approval the principle expressed by Lord Justice FRY: "When a testator or settlor directs or permits the subject of his disposition to remain as shares or stocks in a company which has the power either of distributing its profits as dividends, or of converting them into capital, and the company validly exercises this power, such exercise of its power is binding on all persons interested under the testator or settlor in the shares, and consequently what is paid by the company as dividend goes to the tenant for life, and what is paid by the company to the shareholder as capital, or appropriated as an increase of the capital stock in the concern, enures to the benefit of all who are

interested in the capital.'' That expression is also quoted by Justice GRAY in 136 *U. S.* 549, *supra.*

In Pennsylvania there have been a number of decisions beginning with *Earp's Appeal*, 28 *Pa. St.*, 368. In that case a testator left the residue of his estate to his executors in trust to collect the rents, income and interest and to pay one equal fourth part to and for the use of each of his four children during their natural lives, &c. Among the residuary estate was stock in a manufacturing company upon which large surplus profits over and above the current dividends had accumulated and continued to accumulate for several years after the death of the testator. With the consent of the executors and the legatees the capital stock of the company was increased and new stock distributed among the stockholders in proportion to the stock held by them, the surplus earnings or profits being applied to the payment of such increased shares of stock. It was held that so much of the surplus earnings as accumulated before the death of the testator was principal and subject to the trust, and that the accumulations after the death of the testator were as much a part of the income of the principal as the current dividends, and as such belonged to the legatees of the income for life. The Court decided that the surplus earnings could be apportioned so as to credit the capital with such as had accumulated prior to the death of the testator, and to give to the life tenant those earnings that had accumulated after the testator's death. This case has been followed in Pennsylvania in a number of cases. See *Wiltbank's Appeal*, 64 *Pa. St.*, 256; *Moss' Appeal*, 83 *Penn. St.*, 264; *Biddle's Appeal*, 99 *Penn. St.*, 278; *Vinton's Appeal*, 99 *Penn. St.*, 434, and *Smith's Estate*, 140 *Penn. St.*, 344. Different results were reached in these cases, but the principles settled in *Earp's Appeal* were affirmed. Justice PAXSON, in *Moss' Appeal*, after referring to the general

rule that nothing earned by a corporation can be regarded as profits until it shall have been declared so by the directors, and that the stockholders have no right to claim earnings until the corporation decides to distribute them as profits, said: "But when a corporation, having actually made profits, proceeds to distribute such profits amongst the stockholders, the tenant for life would be entitled to receive them, and this without regard to the form of the transaction. Equity which disregards form and grasps the substance would award the thing distributed, whether stock or moneys, to whomsoever was entitled to the profits."

In *Van Doren vs. Olden*, 19 *N. J. Eq.*, 176, the Chancellor reviewed the early English cases, declined to follow them and said: "Chief Justice Lewis in *Earp's Appeal*, 28 *Penn. St.*, 368, considered the whole matter fully, and settled the law in Pennsylvania on this subject in an opinion prepared with great ability, on what appears to me to be the correct principles to be applied in all such cases." See also *Ashurst vs. Field's Adm'r*, 26 *N. J. Eq.*, 1.

In *Lord vs. Brooks*, 52 *N. H.*, 72, the Court follows *Earp's Appeal*, and says that "the reasoning in *Minot vs. Paine*, is unsatisfactory to us."

The case of *Hite, et al. vs. Hite, et al.*, (*Ky.*) 20 *S. W. Rep.*, 779, decides that "where a dividend, although declared in stock, is based upon the earnings of the company, it is in reality, whether called by one name or another, the income of the capital invested in it. It is but a mode of distributing the profit."

The early New York cases are to the same effect as *Earp's Appeal*. *Clarkson vs. Clarkson*, 18 *Barb.*, 646; *Simpson vs. Moore*, 30 *Barb.*, 637; *Goldsmith vs. Swift*, 26 *Hun*, 201. But they are not decisions of the highest Court in that State, which in *Riggs, et al. vs. Cragg*, 89 *N. Y.*, 479, declined to pass upon the question as it was not necessary to decide it.

Several of the late text books have adopted the Pennsylvania rule as the correct one, and some of them speak of it as the American rule, although they are not correct in stating that this rule prevails in every State but Massachusetts and Georgia. *Cook on Stocks, &c., sec.* 554; 1 *Spelling on Private Corporations, sec.* 457, *n.* 2; 2 *Beach on Private Corporations, sec.* 600.

It will be seen from an examination of the above authorities that they differ very materially as to the proper rule to be established on the main question, as well as on minor matters. But there are some principles involved in the question concerning which most of the Courts are in accord.

It is generally admitted by those Courts which are ordinarily inclined to hold stock dividends to be capital that there may be cases in which they should be held to be income, depending "upon the substance and intent of the action of the corporation as manifested by its vote or resolution," as was said in 136 *U. S. Rep.,* 559. There are but few cases, if any, that can properly be construed to mean that although the stock dividends only included net earnings, and they were intended to be distributed as income, and not as capital, yet the life tenants must be deprived of them simply because they were stock dividends.

When it is possible for the Court to ascertain to any certainty whether the distribution in the stock dividend includes net earnings, and, if so, what proportion, and also whether such earnings were intended to be made a part of the capital or merely to be used temporarily with the intention on the part of the directors of refunding them to the shareholders as income, we think it is the duty of the Court to make such investigations and dispose of the stock in an equitable way between the tenants for life and the remainder-men.

The resolution of the railroad company passed November 11th, 1891, shows that the amount distributed was

a part of the net earnings and income received for the three fiscal years ending September 30th, 1889, 1890, and 1891, and "whereas" it was used by the directors, "therefore resolved that a dividend of twenty (20) per cent. be declared upon the common stock of this company for the period ending September 30th, 1891, payable on and after 31st day of December, 1891." If the resolution had stopped there it could hardly be doubted that the life tenants were entitled to at least a portion of such a dividend, and are they to be deprived of all interest in the dividend simply because it was made payable "in common stock of the company?" We think not. This stock was intended "for the sole and separate use and benefit" of the daughters of the testator during their lives, according to the terms of the will. He wanted them to enjoy the use and benefit of his property as long as they lived. He unquestionably did not contemplate having all the income on over three hundred thousand dollars of his property added to the capital from time to time, although he knew or was presumed to know, that the directors could use it for the legitimate purposes of the company if they deemed it proper. In his original will he expressed the wish that all investments in railroad stocks or in any other like securities left by him, should be kept intact by the trustees as they existed at the time of his death, except such as might become payable or redeemable.

It is true he modified that in the codicil to his will, and authorized a sale of his stock, &c., whenever in the judgment *of all three* of his trustees, a sale would be advantageous to those interested; but if he had supposed that there would be any likelihood of his children being deprived of the income from this stock, he would never have inserted such a provision in his original will, or have made the right to sell dependent upon the judgment "of all three" trustees, one of whom had a con-

tingent interest in all the property after the life estate of the daughters, although he had the most implicit confidence in them.

It is clear that the testator desired his daughters to get the benefit of the income of all his property, and it is equally clear that the company intended to compensate the stockholders for the loss of the income of a definite period, used by them by declaring a dividend to cover that period, viz., "the period ending September 30th, 1891."

This Court has in the case in 6 *Gill*, 363, *supra*, expressly decided that the railroad company can refund to the stockholders the net revenue which had been appropriated to the purposes of the charter, and might borrow money, to supply the place of that which had been used, from the stockholders or any one else. It was decided in that case that the company could give its bonds to such stockholders as were willing to receive them for their portion of the net profits thus used. On page 378 the Court used the word "stock" instead of "bonds" which was probably inadvertently done, but if the company has the power to give its stockholders bonds for net revenue used, it can also issue its stock which it has the authority under its charter to increase. If in this instance the company had issued bonds, the life tenants would have been entitled to their proportions, and why not of the stock issued? We think under the circumstances the life tenants are entitled to their shares of the stock and the only remaining question is how can it be apportioned so as to do justice to all persons interested.

The evidence is not as full as it might be. Section 19 of chapter 123 of the Acts of 1826, the charter of the company, provides that the president and directors shall annually or semi-annually declare and make such dividend as they may deem proper, &c. The resolution of

the directors refers to three fiscal years ending September 30th, 1889, 1890 and 1891, and then declares the dividend for the period ending September 30th, 1891. It is usual for railroad companies to keep such accounts as will show their net earnings, if any, for each period of six months, as well as for the whole fiscal year.

We do not think it would be proper to approximate the net earnings for a proportionate part of the six months, but if it can be accurately ascertained what proportion of the twenty per cent. divided declared by the company was earned in each period of six months, commencing October 1st, 1889, then we think it should be ascertained for each of such periods ending March 31st, 1890, September 30th, 1890, and March 31st, 1891. Having ascertained the amount of net earnings for those eighteen months, it can readily be ascertained what proportion of the 670 shares was earned during that time. One-half of such amount should be allowed John Marshall Thomas, executor of Annie Gregg Thomas, as her proportion—she having died in July, 1891. If the net earnings for the periods of six months cannot be definitely determined, then ascertain them for the fiscal year ending September 30th, 1890, and the proportion of the 670 shares earned during that time, and Mrs. Thomas' estate will be entitled to one-half thereof.

So far as Mrs. Pennington's interest is concerned it will only be necessary to determine the net earnings for the two years ending September 30th, 1890, and September 30th, 1891, then ascertain what proportion of the 670 shares was earned during those two years, and Mrs. Pennington will be entitled to one-half of the same. The proportion of shares earned during the year ending September 30th, 1889, must be treated as capital, and also the Thomas half for the two years ending September 30th, 1890, and September 30th, 1891, after deducting the number of shares to be turned over to Mr. Thomas as above directed.

Thomas, *et al. vs.* Gregg, *et al.*

We think this plan an equitable one. There can be no serious difficulty in ascertaining accurately the net profits earned by the company during each fiscal year of this period of three fiscal years, and it is altogether probable that this can be determined with the same accuracy for the periods of six months. So far as the Pennington share is concerned that is immaterial, but it may affect the Thomas share as we do not deem it practicable or proper to subdivide the periods fixed by the company for dividends.

Whatever those periods were, whether of six months or a year—they should be adopted. We see no objection to thus apportioning the dividends between the life tenants and remainder-men under the circumstances of this case. The resolution of the directors shows on its face that the earnings of the three years were ascertained and the dividend, was declared accordingly. As the earnings for the year ending September 30th, 1889, can be easily told, and that was before the life estate commenced, it is but just and in accordance with the intention of the testator, so far as it is shown, that such earnings be treated as capital.

Such further testimony as may be necessary to meet the views herein expressed can be taken.

It follows from what we have said that the decree of the Court below dated September 7th, 1893, must be reversed, and the cause remanded so that the views herein expressed may be carried out.

*Decree reversed and*
*cause remanded.*

(Decided 25th January, 1894.)