WILLIAM J. BOARDMAN ET AL., TRUSTEES, *vs.* LUCY H. BOARDMAN ET ALS.

Third Judicial District, Bridgeport, October Term, 1905.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, JS.

The general rule, stated in *Smith* v. *Dana*, 77 Conn. 543—that cash dividends upon corporate stock are to be regarded as income and therefore pass to the life tenant, while stock dividends will be treated as capital and go to the legatee in remainder—affirmed and applied.

Boardman v. Boardman.

While there may be exceptional situations in which this rule should not be applied, no exception should be made unless it is clearly demonstrated by those contending for it, that the general rule would, under the special circumstances of the case, work unfairly.

The accumulation of profits in the form of surplus, instead of their distribution as dividends from time to time as they accrue, does not give the remainder interest the right to claim them as a permanent accretion to capital, or to complain of their subsequent distribution as cash dividends.

In the present case the declaration of a large cash dividend was made to facilitate a merger of the corporation with another, and for the immediate purpose of producing an agreed proportion of assets to capital. *Held* that this was immaterial.

Where dividends have been paid from surplus, but it is impossible to say from what specific fund, they will be presumed to have been paid out of profits.

Argued November 7th—decided December 15th, 1905.

AMICABLE SUIT to determine whether certain cash dividends upon stock held in trust belonged to the life tenant or to the remainderman, brought to and reserved by the Superior Court in New Haven County, *Case, J.,* upon an agreed statement of facts, for the advice of this court. *Judgment advised for the life tenant.*

*Henry C. White* and *John Q. Tilson,* for William J. Boardman, trustee, and all the defendants except Lucy H. Boardman.

*Burton Mansfield,* for Lucy H. Boardman, individually and as trustee.

PRENTICE, J. William W. Boardman, who died in 1871, left a will by which he created a trust fund of $200,000. His widow, Lucy H. Boardman, and his nephew, William J. Boardman, are the trustees of this fund. By the terms of the will " the dividends, rents and profits " of the fund were to go to his said wife during her natural life. The remainder over passed into the residue of the estate, which

was given to a sister and the testator's nephews and nieces named in the will. May 7th, 1872, certain securities belonging to the estate were distributed and set apart to this fund. Among them were one hundred shares of the capital stock of the National Bank of Commerce of New York, of the par value of $100 each, and two hundred shares of the capital stock of the Mechanics National Bank of New York, of the par value of $25 each. The former stock was then appraised at $118 a share, and the latter at $33.75, or $135 for each $100 of stock. In 1877 the capital stock of the National Bank of Commerce was reduced one half, by the payment back to the stockholders of the par value of the surrendered stock. This left the holding of the trust fund in this stock at fifty shares. The balance of the original holding was represented by the cash paid as aforesaid in the reduction process. In 1903 the Bank of Commerce took over the assets, business and liabilities of the Western National Bank of New York. This merger or absorption was accomplished by the following process : It was agreed by the parties that the Bank of Commerce should become the purchaser of the assets and business of the Western and assume its liabilities, and that the latter bank should liquidate; that to this end the capital stock of each bank should be increased, that of the Bank of Commerce from $10,000,000 to $25,000,000, of which sum, however, $12,-500,000 should not be issued except to consummate the purchase, and that of the Western to $12,500,000 ; that each bank should have a surplus of $5,000,000 ; that the assets of each, over and above those required to create such capital and surplus, might be declared to its stockholders in dividends, and that when this was accomplished the Bank of Commerce should issue $12,500,000 of its authorized increase in payment for the assets and business of the Western, which should thereupon be transferred to the former bank. This course was pursued, whereupon the Bank of Commerce became one with $25,000,000 of capital and $10,000,000 of surplus, and the Western bank ceased to exist.

In the process thus outlined the Bank of Commerce in-

creased its capital stock by $15,000,000. Of this amount $12,500,000 was retained and $2,500,000 was at once issued so as to raise its existing capital, in anticipation of the merger, to $12,500,000. The right to subscribe for this issue was given to stockholders at the rate of $140 a share, each owner of four shares having the right to take one new share. This right attaching to the stock held by the trustees was exercised by them and the stock thus acquired added to the corpus of the fund. Upon the completion of the preparations for the merger, the bank found itself possessed of assets in excess of its capital of $12,500,000 and of the $5,000,000 of surplus agreed to be retained, and the directors thereupon declared a cash dividend of 57½ per cent. for the purpose of surrendering this excess to the stockholders. Pursuant to this declaration there was paid to the trustees the sum of $2,875 which they now hold. In the communication to the shareholders in which the board of directors first made known the proposed plan of merger, it was stated, in connection with the provision for a large dividend, that " of course the payment of such a dividend is conditional upon and can be made only as a part of the consummation of the plan in its entirety.". For ten years prior to the events last recited, the Bank of Commerce had paid regular dividends of 8 per cent. per annum. In April, 1900, and again in July, 1903, special dividends of small amounts had been declared. Following the payment of said dividend of 57½ per cent., the market value of the stock of said bank did not fall below $215 a share.

In 1904 the Mechanics National Bank of New York absorbed the Leather Manufacturers National Bank of New York by a process precisely similar in all pertinent particulars to that already described. The capital stock of the Mechanics was increased from $2,000,000 to $3,000,000, of which amount $310,000 was issued to its shareholders at par and $690,000 retained and finally issued in payment for the assets and business of the Leather Manufacturers. The Mechanics was to have at the time of the merger and had $2,310,000 of capital and $3,092,174 of surplus, the Leather

Manufacturers $600,000 of capital and $1,017,600 of surplus. The Mechanics, after the transaction was completed and its $690,000 of new stock issued in payment, thus had $3,000,000 of capital and $4,409,000 of surplus. The dividend declared by the Mechanics was at the rate of 39 per cent., yielding $1,950 to the trustees. For ten years prior to the merger the Mechanics had paid ten per cent. in dividends regularly. Subsequent thereto the market price of said stock did not fall below $235 a share. The trustees availed themselves of the opportunity offered to subscribe at par for their pro rata share of the $310,000 issue of stock, and thus took thirty shares.

The source of the funds out of which the dividends in question were paid cannot be traced.

Mrs. Boardman, the life beneficiary, claims that she is entitled to the whole amount of the two cash dividends, paid as above stated. Those representing the remainder interest claim that their amount less only $125, being the equivalent of a regular quarterly dividend on the Bank of Commerce stock, should be added to the corpus of the trust fund. The conflicting claims thus made are the same as those which were under discussion in *Smith* v. *Dana*, 77 Conn. 543, and the conclusions then reached are controlling of the rights of the parties in this case. In that case we reaffirmed the so-called Massachusetts rule, that ordinarily cash dividends upon corporate stock are to be regarded as income and stock dividends as capital. It was not claimed for this rule that it was one whose application would accomplish exact justice in all cases. What was claimed was, that some clear, intelligible and workable rule was a necessity, and that the difficulties in the way of stating any other practical rule were so insurmountable as to render the chosen one, if employed with a due regard for the substance and intent of the vote of declaration, the fairest and best for general use, all things considered, which could be devised.

The application of this rule would confessedly bar the claim here made on behalf of the remainder interest. But

the opinion in *Smith* v. *Dana* recognized the possibility that there might be exceptional situations which would call for exceptional treatment; and the remaindermen here rest their claim upon the assertion that the circumstances of this case reveal such a situation. In the former case we stated our conclusion that the adopted rule, when interpreted and applied as there indicated, was such a judicious one for general application that few, if any, exceptions to it should be admitted. But, whether more or less exceptions are to be recognized, it is clear that no appeal can be successfully made for any which does not find its justification in a demonstration clearly made, that the general rule would under the conditions work inequity and that some other determination of the conflicting claims would lead to results more in consonance with the strict rights of the parties.

In *Smith* v. *Dana* we recognized, and whether by way of an exception or not we had no occasion to determine, that where any part of the capital of a corporation was being surrendered and paid back to the shareowners, although through the form of a cash dividend, the benefit of that dividend should accrue to the capital interest. The reason and justice of this, as according to the parties their clear rights, are evident. It cannot be claimed that there is anything in the circumstances of the present declarations of dividends to make them the means whereby capital was sought to be returned to stockholders. If the case presents any situation which deserves to be regarded as exceptional, it must be found in other conditions. It is claimed to be found in the fact that the dividends were declared as incidents of the merger of two corporations and for the immediate purpose of so adjusting the capital and assets of the merging institutions that the merger could be accomplished. It is not suggested, nor do we discover, how this bears upon the rights of the parties before us. It matters not whether the transactions of which the declarations were incidents are from the point of view of the surviving banks to be regarded as mergers, or as expansions through acquisition, or as something else. The ultimate purpose which the stockholders had in

view can of itself have no significance in our present inquiry. The pertinent question is, what was in fact done in the matter of the declarations, what were the resources drawn upon in the payment of the dividends, and what was their effect upon the assets of the corporations and the stock as bearing upon the conflicting capital and income interests. The investigation to be made is one which looks beneath the surface to discover what there was in the operation or effect of the present dividend declarations which justifies these remaindermen in asserting that they ought in equity and right to have the benefit of them, and that to permit a different result would be to suffer a palpable injustice to be done.

We find the facts to be that the capital of each of the banks in which the trust fund owned stock was increased, the capital interest in the trust stock receiving all the benefit resulting therefrom ; that the funds out of which the dividends were paid cannot be traced to their source ; that after they were paid each bank had an unimpaired capital, the full amount required to be retained by national banks as a surplus fund, any amount—as in the case of the Bank of Commerce—received as contributions from shareholders through the premium paid upon new issues of stock, and a considerable amount of assets besides; and that following the dividend payments the market value of each stock remained at more than $2 for each $1 of capital, and nearly twice as high as it was at the institution of the trust. Revised Statutes of U. S., § 5199.

These facts clearly disclose that there was no surrender of capital in the case of either corporation. The dividends having been paid out of funds which cannot be traced specifically, and their payment having left an unimpaired capital and a net surplus as described, they were paid out of surplus. Having been paid out of surplus, the presumption is that they were paid out of profits. *Smith* v. *Dana*, 77 Conn. 543, 555. There is nothing whatever in the agreed facts to rebut this presumption. On the contrary, as the corporations were both national banks, there is much to indicate that the presumption is one supported by the fact.

Revised Statutes of U. S., §§ 5136, 5137. The remaindermen have therefore failed to show, and the burden is upon them to do so, that the operation of the rule of general application would be to wrongfully injure the capital interest by a diversion therefrom of something to which it is rightfully entitled, or in some other manner. Their contention, when analyzed, resolves itself into one whose sole foundation is the mistaken notion which is so frequently advanced in support of the claims of remaindermen, that in some unexplained way profits which are not promptly declared in dividends, but are, for some reason or other influencing the exercise of that large discretionary power which is vested in directors, permitted to accumulate in the form of surplus, acquire some sort of character which deprives the income interest of any equitable claim upon them even if they later chance to follow the course they might have originally followed and go out in cash dividends, and entitles the capital interest to the benefit of them as an accretion thereto, whatever course may be thereafter pursued in respect to them. It was one of the aims of the opinion in *Smith* v. *Dana* to combat that fallacy.

In reaching our conclusion we have given to the language of the will creating the trust which gave to Mrs. Boardman " the dividends, rents and profits " of the fund, no peculiar significance favorable to her, but, for the purposes of this case, have assumed without deciding, that the quoted words were synonymous with " use and income," as the remaindermen claimed they were.

The Superior Court is advised that Mrs. Lucy H. Boardman is entitled to receive from said trustees the full amount of said two dividends received by them.

Costs in this court will be taxed in favor of Mrs. Boardman and against the other defendants.

In this opinion the other judges concurred.